**SIGNED THIS: June 01, 2010**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| THOMAS L. BLEDSOE, | ) | No.  09-80824 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| GREG BLEDSOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No.  09-8052 |
| | ) | |
| TOM BLEDSOE, | ) | |
| | ) | |
| Defendant. | ) | |

**O P I N I O N**

This matter is before the Court after trial on the complaint filed by Greg Bledsoe (GREG) against the Debtor, Thomas Bledsoe (DEBTOR), his brother, seeking a determination of nondischargeability under Sections 523(a)(2)(A) and (a)(4) for debts arising out of a joint business venture gone bad.[1]

---

[1] Additional counts under Section 523(a)(6) and Section 727 were previously dismissed as premature or inapplicable in this Chapter 13 case.

**FACTUAL BACKGROUND AND EFFECT OF STATE COURT JUDGMENT.**

The DEBTOR filed his Chapter 13 petition on March 18, 2009, and scheduled unsecured debts totaling $103,100, including a debt to GREG for $35,000. The debt to GREG is evidenced by a state court judgment entered by the Circuit Court for Peoria County in Case No. 04 CH 628, entitled Greg Bledsoe, Plaintiff, vs. Tom Bledsoe and GT Bleds Corporation, Defendants.

As reflected in the state complaint, as well as in the evidence presented at trial before this Court, the Bledsoe brothers jointly engaged in a tree planting business in 2001 and 2002. Although some start-up work was done in 2001 and January, 2002, the actual tree planting work for customers was performed after the DEBTOR formed GT Bleds Corporation on February 20, 2002. The brothers had a falling out over the business on April 23, 2002, when GREG walked off the job.

In the state court complaint, GREG claimed a 50% interest in the profits of the business and sought an accounting of the profits and for jointly owned assets transferred to the corporation by the DEBTOR. The complaint also sought a judgment for one-half of the dividends paid to the DEBTOR by the corporation. It is undisputed that the corporation paid the DEBTOR dividends of $39,600 while paying no dividends to GREG. It is also undisputed that GREG made two loans to the business totaling $12,500 as start-up capital.

After a bench trial, the circuit court entered judgment for GREG on September 11, 2008. The judgment has two components. First, GREG was awarded $16,562.50 on account of the loans he made, consisting of the principal of $12,500 plus interest of $4,062.50.

Second, GREG was awarded $25,400 as his share of the profits of the venture, although this amount was later reduced to $17,747.80 by order entered December 9, 2008.

Neither order makes any finding or determination that the DEBTOR engaged in fraud. Although the state complaint makes certain allegations of fraudulent conduct by the DEBTOR, the judgment for the loans and the profits does not depend on a determination that the DEBTOR committed fraud. Since the state court made no express finding of fraud, this Court must treat the judgment as one not based on fraud for collateral estoppel purposes.

The state court judgment, as amended, will be accorded claim preclusive effect as to the nature of and the amounts of the debts, but not as to whether the DEBTOR engaged in fraudulent conduct. *See, e.g., In re Walker,* 416 B.R. 449, 465 (Bankr.W.D.N.C. 2009); *In re Mukhi,* 254 B.R. 722, 727 (Bankr.N.D.Ill. 2000). So this Court recognizes as adjudicated facts that the DEBTOR owes GREG two prepetition debts: $16,562.50 for the loans GREG made to the business, and $17,747.80 as GREG'S share of the profits of the business. Neither party may contest or relitigate those facts or assert other causes of action arising out of the same transaction.[2]

**SECTION 523(a)(2)(A) CLAIM.**

The burden is on the creditor to establish each element of the exception to the dischargeability of its debt by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661 (1991). In order to afford the debtor a "fresh start," exceptions

---

[2]The doctrine of *res judicata* provides that a final judgment on the merits bars any subsequent actions between the same parties. The doctrine extends not only to what was actually decided in the original action, but also to claims that could have been raised in that suit. *Westmeyer v. Flynn,* 382 Ill.App.3d 952, 955-56, 889 N.E.2d 671 (Ill.App. 1 Dist. 2008).

3

to discharge are construed strictly against the creditor and liberally in favor of the debtor. *In re Morris,* 223 F.3d 548 (7th Cir. 2000).

In pertinent part, Section 523(a)(2)(A) provides:

> (a) A discharge under section . . . 1328(b) of this title does not discharge an individual debtor from any debt–
> * * *
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Under a traditional analysis of this section, the creditor must prove that (1) the debtor made a representation to the creditor; (2) at the time of the representation, the debtor knew it to be false; (3) the debtor made the representation with the intent and purpose of deceiving the creditor; (4) the creditor relied on the representation resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). More recently, the Seventh Circuit has held that a claim for actual fraud under this provision need not be based upon a false representation. *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000). Rather, the court explained that actual fraud "consists of any deceit, artifice, trick, or design involving [the] direct and active operation of the mind, used to circumvent and cheat another – something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."

The fraud exception to the dischargeability of debts in bankruptcy does not encompass constructive frauds, only actual frauds. *Id.* at 894. For example, a fraudulent conveyance that is only constructively fraudulent because it was not made with an intent to defraud, is not excepted from discharge. *Id.* The creditor must prove not only that a

4

fraud occurred, but that the fraud created or gave rise to the debt. *Id.* at 894-95; *In re Spigel,* 260 F.3d 27, 32 (1st Cir. 2001). Fraudulent conduct that occurs after the debt is already due and owing is usually not actionable. This is just another way of saying that there must be a causal connection between the fraud and the creditor's claim. *See McClellan,* at 894-95. However, a post-debt fraud may be actionable if it gives rise to stand-alone, independent liability. *Id.*

In the case at bar, the *res judicata* effect of the state court judgment precludes any fraud claim as a basis of new liability against the DEBTOR. In order to prevail, GREG must prove that the DEBTOR engaged in fraudulent conduct, false pretenses or made a false representation and that such conduct is causally connected to the loans he made or to nonpayment of his share of the profits, the two debts determined to exist by the state court.

GT Bleds Corporation was incorporated on February 20, 2002. Prior to that time, the parties were operating the joint venture without the benefit of a corporation. Exhibit 1 evidences that GREG made his first loan in the amount of $5,000 on December 7, 2001, for the purchase of planters, and a second loan of $7,500 on February 4, 2002, used to pay a deposit for the purchase of trees.[3] It is undisputed that the funds were used for their intended purpose. GREG does not contend that the DEBTOR intended not to repay the loans or otherwise had fraudulent intent at the time they were made, and there is no evidence to support such a claim. Instead, GREG asserts that after the proceeds from the jobs came in and the funds were available to repay the loans, the DEBTOR chose not to repay them and expended the funds by paying large dividends to himself. GREG argues

---

[3]GREG testified that the amount of the first loan was actually $5,700. The *res judicata* effect of the state court judgment, however, precludes relitigation of that issue.

that the DEBTOR acted with ill will toward him as a result of the dispute that caused GREG to cease providing his services to the enterprise.

The evidence surrounding the dispute is contested. The brothers agree that the profits were to be split 50/50, and that no other compensation would be paid. Neither party makes any claim that he was entitled to be paid a salary or hourly wage. Wages were paid only to the employees hired by GREG to assist in the tree planting.

The brothers disagree about how the workload was to be shared. The DEBTOR testified that, in addition to fabricating a 2-row planter, GREG was to be responsible for the actual planting of the trees, including hiring and supervising laborers, and that GREG agreed to these terms. GREG saw it differently, testifying that he expected the DEBTOR to help equally with the planting work. He testified that he planted for 15 days without any help from the DEBTOR. When he confronted the DEBTOR about it, the DEBTOR told GREG that the planting was his responsibility.

On April 23, 2002, GREG had had enough and walked off the job. He did no further work for the business. The DEBTOR testified that he took over the planting responsibilities and worked through July, 2002, to finish the two jobs that were under contract. At that point, the business ceased to function and no new contracts were entered into. The corporation was involuntarily dissolved on July 1, 2004.

When the customers paid what they owed, and the corporation had the funds, the DEBTOR chose not to repay the loans made by GREG.[4] Instead, the DEBTOR made a settlement offer to pay the amount due on the loans only if GREG would agree to release

---

[4] The corporation's general ledger reflects receipts of $121,717.00 from DRD Farm/RDR Farm on August 30, 2002, and $12,386.25 from Jim Wagoner on October 7, 2002.

6

his claim for an equal share of the profits. GREG rejected the offer. The corporation's funds were subsequently fully dissipated via the payment of dividends to the DEBTOR. The payment of a dividend by a corporation that renders it insolvent is wrongful. 805 ILCS 5/9.10(c)(1). The wrongful payment of dividends by GT Bleds Corporation does not necessarily equate to fraud by the DEBTOR, the sole control person, even though it deprived the corporation of the funds necessary to pay GREG.

The Court determines that GREG has not sustained his burden to prove that the DEBTOR'S debt for the loans was one for money obtained by false pretenses, a false representation or actual fraud. There is simply no evidence that the loans were made on account of any dishonesty or fraud engaged in by the DEBTOR. Certainly, the DEBTOR chose not to repay the loans, and chose, instead, to pay all the corporate funds to himself as dividends. But the dividends were paid without any communication with GREG. Although GREG held the title of vice president of the corporation, the DEBTOR was the sole director and shareholder, so he could, and did, cause corporate actions to be taken unilaterally, without GREG'S notice or consent. While GREG'S debts were not paid, the mere failure to pay a debt or honor a contract, even if intentional and without excuse, is not actionable under Section 523(a)(2)(A). *In re Norton,* 248 B.R. 131, 133-34 (Bankr.W.D.Wis. 2000); *In re Kountry Korner Store,* 221 B.R. 265, 272 (Bankr.N.D.Okla. 1998).

With respect to the failure to pay GREG 50% of the profits, the analysis is similar. When the profit-splitting arrangement was agreed to, there is no evidence that the DEBTOR had anything other than an honest intent to pay his brother half the profits. The

DEBTOR later changed his mind, deciding not to pay GREG any portion of the profits.[5] No false representation to GREG by the DEBTOR accompanied that decision. Like the debt for the loans, nonpayment of the profits was, at most, a breach of contract that is outside of the purview of Section 523(a)(2)(A).

**SECTION 523(a)(4) CLAIM.**

The Court will now turn to the claims under Section 523(a)(4) which excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). GREG does not claim that the evidence proves larceny. He contends adequate proof has been adduced of fiduciary fraud or defalcation and, alternatively, of embezzlement. GREG'S primary contention is that the DEBTOR owed him fiduciary duties and violated those duties by absconding with all the profits earned by the business.

In order to prevail under the fiduciary liability portion of the statute, the creditor must prove that (1) a fiduciary relationship existed, (2) the debtor engaged in fraud or defalcation in the course of that relationship, and (3) the creditor was harmed as a result. *See, In re Burke,* 405 B.R. 626, 649 (Bankr.N.D.Ill. 2009). Whether a debtor is a fiduciary is a question of federal law, although state law is consulted for guidance. *In re McGee,* 353 F.3d 537, 540 (7th Cir. 2003); *In re Regan,* 477 F.3d 1209 (10th Cir.2007).

The Court of Appeals for the Seventh Circuit has addressed on several occasions what it means to be a fiduciary under Section 523(a)(4). *In Matter of Marchiando,* 13 F.3d

---

[5]From his testimony, it is not clear when the DEBTOR changed his mind or why. Likely he believed GREG had forfeited his right to profits by walking off the job. The DEBTOR testified that he did not pay GREG on the advice of his accountant and his attorney. Ultimately, of course, the circuit court found the DEBTOR liable for a portion of the profits. The record is void of evidence showing how the state court calculated the amount of the profits due GREG.

1111 (7th Cir. 1994), a case involving a debtor who sold lottery tickets and failed to pay the State of Illinois the proceeds, the court identified as key the distinction between a trust or other fiduciary relation that has an existence independent of the debtor's wrong and one that has no real existence before the wrong is committed. *Id.* at 1115. Emphasizing the need to find real fiduciary duties imposed in advance of the breach, the court recognized that such duties usually flow from a difference in knowledge or power between the fiduciary and the principal that gives the former a "position of ascendancy" over the latter. *Id.* at 1116. The court reasoned as follows:

> The fiduciary may know much more by reason of professional status, or the relation may be one that requires the principal to repose a special confidence in the fiduciary; both factors are present in the case of a lawyer-client relation and also the relation between director and shareholder or managing partner and limited partner. Or the principal may be a child, lacking not only knowledge but also the power to act upon it. These are all situations in which one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals.

*Id.* This kind of a relation of inequality imposes a duty on the fiduciary to protect the principal's interest with the same "solicitude" that he would give to his own interest. *Id.*

Additional guidance may be gleaned from *Matter of Woldman,* 92 F.3d 546 (7th Cir. 1996), where two lawyers engaged in what the court characterized as a joint venture to try a case and split the fee. Recognizing that Illinois law makes joint venturers fiduciaries of one another, the court concluded that the debtor, who took and spent the entire fee, breached his fiduciary duty as a matter of state law. The inquiry didn't end there, however, since "only a subset of fiduciary obligations is encompassed by the word 'fiduciary' in section 523(a)(4)." *Id.* at 547. Noting a split of authority over whether fiduciary

obligations between equals are part of that subset, the court reiterated its holding in *Marchiando,* that Section 523(a)(4) covers "only those fiduciary obligations in which there is substantial inequality in power or knowledge in favor of the debtor seeking the discharge and against the creditor resisting discharge." *Id.* Because the lawyers were equals and no real fiduciary duties existed prior to the defalcation, the breach was outside of the scope of Section 523(a)(4). *Id.*

In *In re Frain,* 230 F.3d 1014 (7th Cir. 2000), thoroughly reviewing its decisions in *Marchiando* and *Woldman,* the Seventh Circuit addressed a situation involving three individuals who formed a corporation to provide title insurance services. Frain, the debtor, owned 50% of the stock and controlled the business on a day-to-day basis. The other two were each 25% owners and also made loans to the business; Frain did not. Contrary to the shareholder agreement, Frain caused shareholder distributions to be made, in which he shared, without first paying off the loans. When Frain filed for Chapter 7 relief, the other two shareholders filed a complaint under Section 523(a)(4) alleging that Frain's liability for the loans should be excepted from discharge. The lower courts found for Frain on the basis that no fiduciary relationship existed. The Seventh Circuit reversed.

Although Frain's control of the day-to-day business decisions gave him a "natural advantage over the other two shareholders in terms of knowledge of the corporation's finances," this superior knowledge was not sufficient by itself to "establish a position of ascendancy." *Id.* at 1017. The critical factor was that the "concentration of power was substantially one-sided." *Id.* Frain's control over the business and ownership of 50% of the shares "gave him significant freedom to run the corporation as he saw fit, including

oversight of such items as salary and distributions of corporate cash flow," with the only real limit to his power being the chance of a deadlock on a shareholder vote. *Id.* at 1018.

Since Frain's position as chief operating officer gave him more knowledge, and the shareholder agreement gave him substantially more power than the co-owners, a fiduciary relationship was created by the structure of the corporation, which gave Frain a "position of ascendancy." *Id.* Rejecting Frain's argument that violations of a contract entered into by equals are not covered by Section 523(a)(4), the court determined that Frain had pre-existing fiduciary duties owed to the other shareholders that arose because of Frain's "substantial ascendancy" over them, independent of any breach of contract. *Id.*

Finally, in *In re McGee,* 353 F.3d 537 (7th Cir. 2003), the court determined that a city code provision requiring landlords to hold security deposits in a segregated interest-bearing account that remained the property of the tenants, was sufficiently trust-like to support liability for fiduciary defalcation under Section 523(a)(4). A disparity in power or knowledge between the landlord and her tenants did not exist and the court emphasized that while such disparity is often a characteristic of a fiduciary relationship, it is not a necessary precondition. *Id.* at 541.

Based upon Seventh Circuit precedent, then, it is clear that Section 523(a)(4) encompasses trusts created by agreement or imposed by statute, to the extent that traditional fiduciary duties preexist the act of defalcation. *See Follett Higher Education Group, Inc. v. Berman,* --- B.R. ----, 2010 WL 1292484 (N.D.Ill. 2010). In those circumstances, it is not necessary to make further inquiry into the nature of the relationship between the fiduciary and the principal. In the absence of a trust agreement or a statute, however, the

focus turns to the relationship characteristics, since true common law trust relations are usually evidenced by a disparity in knowledge, power or economic status.[6]

The case at bar does not involve a trust agreement or a statutory trust, so the proper inquiry is whether the kind of common law trust exists that according to the Seventh Circuit would fit under Section 523(a)(4). GREG was certainly a creditor of GT Bleds Corporation who was owed fiduciary duties upon insolvency and dissolution. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 384 (7th Cir. 2008); *In re Reuscher,* 169 B.R. 398, 402 (S.D.Ill. 1994). But he was not just an ordinary trade creditor. The brothers engaged in the tree planting business as a joint venture. The corporation was formed in furtherance of that venture. Ultimately, the allocation of power between them was defined through the corporation's organizational structure. Under these circumstances, similar to those in *Frain*, the relational disparity analysis is the proper course of inquiry.[7]

Although GREG was an officer of the corporation, he was not a director or shareholder. His position as vice president might ordinarily indicate that he wielded a certain amount of power and authority. The facts contradict that assumption. GREG was an officer in name only. The DEBTOR was the sole shareholder and director, and served as the CEO and CFO. The DEBTOR exercised exclusive control over the corporation's finances, its major decisions and, ultimately, its distribution of profits. The DEBTOR

---

[6] The Seventh Circuit has made it clear that not all common law trusts recognized under state law will come within the scope of Section 523(a)(4). Certainly, constructive trusts, resulting trusts and the like, that have no existence until the wrong is committed do not qualify.

[7] As held by the Seventh Circuit in *Woldman, supra,* while joint venturers are fiduciaries of each other under Illinois law, Section 523(a)(4) only covers the subset of situations where there is a substantial inequality in power or knowledge between them.

managed the corporation and kept the books and records in his business office. GREG'S actual authority was limited to supervising workers in the field. Under these circumstances, the concentration of power was substantially one-sided in favor of the DEBTOR. The DEBTOR, in unilaterally setting up the corporate structure, chose to give himself absolute control over its affairs. He could have shared power with GREG by making GREG a shareholder or a director, but he elected not to. In this case, similar to *Frain,* a fiduciary relationship existed because of the substantial disparity of power and authority that favored the DEBTOR. GREG has demonstrated by a preponderance of the evidence that the DEBTOR was acting in a fiduciary capacity with respect to him at and prior to the time the decision to pay dividends was made.

As used in Section 523(a)(4), "defalcation" means the misappropriation of trust funds held in a fiduciary capacity. *In re Zois,* 201 B.R. 501, 506 (Bankr.N.D.Ill. 1996). An objective standard is used to determine a defalcation; bad faith or fraudulent intent is not required. *In re Pawlinski,* 170 B.R. 380, 389 (Bankr.N.D.Ill. 1994). A defalcation is something less than fraud. Fraud encompasses a scheme to cheat another from the outset of a transaction, while absconding with trust funds absent a scheme to defraud is better characterized as a defalcation. *Woldman, supra* at 547. Undoubtedly, a fiduciary who intentionally withdraws and spends trust funds engages in defalcation. *McGee, supra* at 539.

As a fiduciary, the DEBTOR was obligated to protect and preserve the corporate funds for the benefit of GREG, to the extent of GREG'S claims. By causing all of the funds to be paid to himself in the form of dividends, without paying GREG or reserving sufficient

funds to pay GREG once his claims were adjudicated, the DEBTOR committed an act of defalcation. It is no defense that the dividends were paid out on the advice of counsel or the accountant, since the standard is an objective one and intent to defraud is not necessary.

That the DEBTOR was disputing one of GREG'S claims, his contractual right to share the profits, is also no defense. As a fiduciary, it was incumbent upon the DEBTOR to preserve the trust funds for GREG'S benefit until the disputed claim was determined, settled or released. By paying out all of the funds to himself, the DEBTOR violated his fiduciary obligation to the direct detriment of GREG. *Cf. In re Kallmeyer,* 242 B.R. 492 (9th Cir.BAP 1999) (where corporation was insolvent and had ceased doing business at the time sole director caused it to make payments for her benefit, resulting debt to injured corporate creditor was nondischargeable as one for money obtained by debtor's defalcation while acting in fiduciary capacity). GREG has proved by a preponderance of evidence that the DEBTOR engaged in defalcation while acting in a fiduciary capacity that caused GREG to suffer a financial loss.

The final issue is one of damages. The dividends paid by the corporation to the DEBTOR total $39,600. The state court awarded GREG, per the modified judgment, the sum of $34,310.30. The trust funds were sufficient to have paid GREG in full, so the loss caused by the DEBTOR'S defalcation is the full amount of the modified judgment. Since a prepetition state court judgment is already in place, it is not necessary for this Court to liquidate the debt or enter a separate and new money judgment. It is enough to determine that the debt owed to GREG, evidenced by the state court judgment order, as modified, is excepted from discharge. *See In re Heckert,* 272 F.3d 253, 257 (4th Cir. 2001) (in

14

nondischargeability proceeding, bankruptcy court's entry of its own money judgment to replace state court judgment is barred by *res judicata*). Judgment of nondischargeability will be entered in GREG'S favor. Given this result, it is not necessary to consider GREG'S alternative theories.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###